to the next case on today's calendar. That is Bennett v. Commissioner of Social Security. Mr. Radel, am I pronouncing that right? Radel, yes. Sorry about that. Mr. Radel, you've got ten minutes total, but two minutes you reserve for rebuttal. So you may proceed, but maybe we ought to start with the issue that was presented yesterday in the government's letter. So your client had subsequent applications to Social Security for disability benefits which were granted. She's only, as I understand it, getting benefit payments going forward after 2019, but there was a finding of disability that had its onset during the period of the disputed application here. Correct, yes. Okay, and so is this something that's news to you? It was news to me, yes. I did speak with counsel who handled the file on behalf of the claimant at the administrative level and the district court. He did advise me of that. He, I don't think, noticed the fact that the state agency had included within its determination that my client was entitled to benefits that the alleged or the determination of onset of disability was back to November of 2015. Okay, so this is the first time you're learning, and so why does this matter and what do you want to do about it? Right, I think that it, in terms of the issues before the order that is under review here, dealt with the question of whether my client was entitled to benefits for the period between November 23rd of 2015 and October 24th of 2018, which was the date of the ALJ's decision. Although my client was awarded benefits pursuant to the subsequent application, that only has been paying her benefits. I don't think anybody's suggesting it makes this moot, but does it matter? In other words, there was a suggestion in the government's letter that you might want to make a supplemental briefing based on these later developments. Yes. Is that true? I have not, finding out about it yesterday, I have not had the opportunity to research the issue fully. It is my understanding, though, that because that's a determination made by the state agency, it's not necessarily binding on the Commissioner of Social Security in terms of. So my client was awarded benefits at the agency level, state agency level, and that determination as to that agency's rights to the onset of disability is not necessarily binding on the government. I gather the agency's determination here wasn't binding on the state, since it seems in conflict, right? Correct. But, so you don't want to supplement your briefing? I would like the opportunity, Your Honor, to reserve that right to supplement my briefing based on further research, but in terms of moving forward with today, I think there's a likelihood the issues for today still remain live because there is this issue of unpaid period of time for benefits. Yeah, I don't think anyone's suggesting it's a moot case. Okay, so go ahead. Thank you. So after high school, Marie Bennett worked for 23 years as a secretary and patient access representative for a Syracuse hospital. She suffered a traumatic brain injury in 2011. Marie returned to work following her injury, but experienced memory problems, pain and panic attacks, and was terminated in November of 2015. It is undisputed that Marie has several severe impairments within the meaning of the Social Security Act. It's also undisputed that she can no longer perform her past relevant work. In this appeal from denial of disability benefits, we raise two main arguments. Our first argument relates to Marie's ability to rotate her head and neck during the course of workday. The record demonstrated that Marie experiences pain and stiffness along with vertigo-like dizziness when she turns her head and neck. Two medical opinions, one from a consultative examiner and another from a treating physician's assistant, indicate limitation with respect to Marie's ability to turn her head. And what's unusual here is that the ALJ acknowledgedly failed to consider the evaluation of the consultative examiner, Dr. Lorenzen. But the appeals counsel did, right? The appeals counsel did, but the appeals counsel found essentially the failure to consider Dr. Lorenzen's opinion harmless because- Well, they said it actually, that it actually supported the ALJ's decision, right? Because they were of the view that Dr. Lorenzen did not indicate any functional limitations beyond those assessed by the ALJ in his RFC determination. That's actually not the case. Dr. Lorenzen assessed mild limitation with respect to Ms. Bennett's ability to rotate her head. Well, I thought the finding was that Dr. Lorenzen found that Bennett could do a wide range of daily activities, had full cervical flexion and extension, and only mild limitation in turning her head sideways. Yes, Your Honor, but nevertheless, that is an additional limitation that was not included in the ALJ's RFC determination. And what I'm saying, there are two issues there. One is that it sort of begs the question to say, well, Dr. Lorenzen assessed mild limitation, therefore, we're assessing mild limitation. Well, no one actually said that. The appeals counsel didn't actually say that. They appeared to not recognize that Dr. Lorenzen had assessed this limitation with respect to rotating the head and neck. And that adding that limitation to the record changes the complexion of the record. So you have Ms. Bennett's testimony that she had limitation in turning her head and neck. You had the treating physician's assistant's opinion that Ms. Bennett had limitation in turning her head and neck. You had physical therapy notes documenting the difficulties when she rotated her head. Now, you add to that Dr. Lorenzen's confirmation, again, different in degree, but similar in kind, recognizing that she has limitations in the ability to rotate her head and neck. There should then be, given that evidence, as fully supplemented and developed with Dr. Lorenzen's opinion, there then needs to be a logical bridge between that evidence and an RFC determination that contains no limitation whatsoever between on Ms. Bennett's ability to rotate her head and neck. Well, the appeals counsel relied on certain notes from Ms. Barbara's evaluation, where Ms. Bennett reported that she went to a water park or something. And also, there was a treatment note that said that Ms. Bennett had a full range of motion. But there were also treatment notes indicating that she had, physical therapy notes indicated she had reduced range of motion. And the water park actually judged, when you look at the therapy note when she went to the water park, she actually went to the water park and reported that it was a big mistake, she had terrible pain, she was seeking help because she had aggravated it by going to the water park, and there was only an indication that she did that one time. And the record instead is consistent with significant pain and limitation. Again, I think at least partially endorsed by the consultative examiner who recognized that she did have some limitation in the ability to rotate her head and neck. Our second argument is with respect to the treating physician rule. This court has consistently recognized the importance of treating physician opinion, particularly when it comes to mental health limitations. Here, Dr. Allow, the treating psychiatrist, assessed limitation in Marie's mental ability and here, your honor, four mental health professionals all assessed some limitation in Ms. Bennett's ability to maintain a schedule. Dr. Grosso, the consultative psychological examiner, Dr. Brown, the state agency review consultant, Dr. Allow, the treating psychiatrist, and Ms. Barbara, the treating nurse practitioner. All four of those mental health professionals assessed at least some degree of limitation in Ms. Bennett's ability to sustain a schedule. Which was particularly relevant because it was the panic attacks and anxiety and depression that caused her to lose her long term employment at the hospital. And there is, again, no logical bridge, no explanation in the ALJ's decision or the appeals council's decision as to how you reach an RFC determination that presumes that she is able to maintain a consistent work schedule. Is it possible that the commissioner accounted for that limitation in concluding that she was limited to unskilled work with simple repetitive tasks? That's the best we could sort of hope for, that we could try to strain to say that the presumption is that that's what that's trying to account for. But it doesn't include limits on her ability to handle stress or production quotas or what we would ordinarily assume would be included to try to account for that type of limitation. And in any event, your honor, that should have been explicit. If the commissioner was reconciling all of the mental health testimony to the effect that she had limitations with regard to her ability to maintain a schedule. And was trying to account for that through that pretty limited carve out from the RFC determination. That should have been, we need a logical bridge that explained why that was the result that was reached. But there's some evidence in the record to suggest that your client was not suffering from anxiety, depression, sleep disturbances, dizziness, vertigo, right? I mean, that's what the ALJ and the appeals council pointed to in deciding that this would be a situation where the treating physician was not to be given sort of the presumption of verity. And that there were other things that contradicted what the treating physician said, right? I think, your honor, there are certainly elements of the record where my client was able to be appropriate and cooperative during medical appointments and was able to engage in some limited activities of daily living. So unless you can prove that on every day the person was intact, then we have to defer to a treating physician. I think this court's authority is that the mere reference to isolated incidents of ability to maintain appropriate behavior is not in and of itself sufficient to overcome the treating psychiatrist's assessment. I think particularly here what needed to be accounted for was, so in other words, we took the treating psychiatrist and compared it to the ALJ and appeals council's review of the record and assessment of what the record said. But that needed to have been done in light of the fact that four mental health professionals looked at this record and concluded that she had some degree of limitation in her ability to maintain a schedule. And that consistency between those opinions merited, necessitated, a thorough going discussion by the appeals council, by the ALJ, to explain how they reconciled that evidence and how they reached the conclusion that Ms. Bennett could in fact sustain a regular work schedule. All right, well I see we're over, but you've still got two minutes to rebuttal, so thank you, Mr. Radel. We'll now hear from Ms. Carter on behalf of the government and the commissioner. Good morning, your honors. May I please report? Can we just start with your letter from yesterday? Yes, your honor. It wasn't clear to me exactly what you're saying. You're not agreeing to a remand here, right? No, your honor. The letter was intended to, primarily to notify Mr. Radel, because it didn't appear that he was aware of the subsequent finding. And in the interest of full disclosure and out of an abundance of caution, we did it in the form of a letter letting the court know as well. But why, so what would be the proper next step? Maybe it's proper to reopen briefing on this, you think? That would be for the appellant to decide. And my understanding is that district court counsel, who had this evidence in his possession for five months, chose not to do anything with it. So that would perhaps be a defense that the government would use. So you're reserving the right to oppose any request for a submission? We would not oppose, we would respond on the merits of a submission. We wouldn't argue that it was waived because it was done after argument or something like that. But we would- But why? I mean, I guess I'm trying to figure that out. So this is information that could have been included in whatever materials were put in the appellate brief, or could have been the basis for seeking a remand. Yes, your honor. That wasn't the case, and on the eve of argument, you learn something, you tell counsel, and now we should just sort of stop and start over? I don't think that you should, your honor. But we should nonetheless take a brief on this, and then let you respond. Only if the appellant asks you to. Right, but you're saying you wouldn't oppose him filing a brief, right? We would not, because- Because why? I'm trying to figure it out. So you think that we should routinely just allow people to file supplemental briefs when they learn about new facts, even though they had them well before the date of briefing? No, your honor, not at all. And if that's your position, we are fully supportive of that. No, I'm just surprised that you're not even reserving the right to oppose the supplementing of the record. It hasn't even been asked for yet. Mr. Radels may have been asking for it. It wouldn't be a supplementing of the record, your honor. Well, supplementing of the briefing. Yes, your honor. The subsequent evidence is never going to be before this court. Right, so what would be the relevance for briefing purposes? Are you asking me to tell opposing counsel what his mechanism would be? I don't understand why, what would be the point of reopening this for a briefing, if this new information that you disclosed yesterday is not really going to be properly before us? I don't believe there is a point, your honor. This filing was done out of an abundance of caution and in full candor to the court. And I appreciate that, but I don't think your government lawyer, it's a potentially relevant fact. It came to your attention, you brought it to opposing counsel and the court's attention. Precisely. Just as you should. Precisely, your honor. Precisely. Thank you, your honor. To the merits, this court should affirm the commissioner's decision here. The commissioner's final decision is that of the appeals counsel, which adopted the ALJ's findings, conclusion and rationale and added further explanation to support the conclusion that Ms. Bennett was neither physically nor mentally disabled. Regarding the physical RFC, the record did not require a reasonable fact finder to assess specific limitation on movement of Ms. Bennett's neck. The appeals counsel reasonably found that Dr. Lawrenson's opinion supported the RFC as the ALJ had assessed it without further limitations. Dr. Lawrenson noted and opined that Ms. Bennett had mild limitations in turning the head. And this opinion did not require the appeals counsel to add specific additional limitations to the RFC. As detailed in the commissioner's brief, numerous courts within this circuit have upheld RFCs similar to the one assessed here based on similar opinions of only mild limitations in turning the head. And those decisions contradict the notion that a reasonable fact finder would have been required to look at Dr. Lawrenson's opinion and assess greater limitations. Regarding the mental RFC, substantial evidence supports the finding that Ms. Bennett could mentally sustain full-time work involving simple instructions and routine repetitive tasks. Well, here the issue is the treating physician rule, right, which is no longer the same problem that it is for you here because the rule has changed or disappeared in essence. But so let's then focus on that. So what was the basis for the commissioner to disregard the opinion of the treating physician, Dr. Allow? I will address that question. I just want to make clear, I want to respond to both of Mr. Rado's points regarding both the treating physician rule and the question of what the other opinion said. Okay, that's fine. But let's start with the treating physician rule. Certainly. As to the treating physician rule, the ALJ accurately recited Dr. Allow's opinion and noted that Dr. Allow's explanation for the opinion was that the limitations were attributed to short-term memory loss and anxiety. And the ALJ explained that that was not consistent with the record evidence, which showed intact or on one occasion mildly impaired memory and no confusion. And so under the regulations, the ALJ was required to consider the consistency of the opinion with other evidence and appropriately on this record found that it was not consistent with records that said the exact opposite of what Dr. Allow had attributed those limitations to. Dr. Allow also, in addition to memory loss, cited anxiety. His opinion was given in April 2018. And in February and June of 2018, Ms. Bennett affirmatively denied anxiety to her treating provider at that time. So again, both of the bases that Dr. Allow cited to as the basis for his opinion were not consistent with the record. And under the regulations, as well as this Court's precedent, interpreting those regulations, that was a proper reason to discount his opinion. As to the other opinions, Dr. Grassl's and Dr. Brown's opinions both fully support the RFC. Dr. Grassl opined that Ms. Bennett had mild limitations maintaining a schedule. Again, it's not the case. Didn't every medical professional on the record reach a conclusion that there was some limitation on the ability to sustain a schedule? Dr. Grassl said a mild limitation and Dr. Brown said no significant limitation. So to the extent that they all mentioned that area, that is true. But the degree is very wide-ranging. Mild and no significant limitations. Dr., I'm looking at, I don't have it in front, but A75, Dr. Brown said Bennett would have, quote, moderate limitations in her ability to abide by a work schedule, is that right? He said, looking. And then said was not, Bennett's not significantly limited in her ability to perform within a schedule, maintain regular attendance or be punctual. Yes. But first, that there are moderate limitations in the ability to abide by a work schedule. He said, looking, I'm looking at A75 of the district court record, 1A, page 8. He said no significant limitation in maintaining attention and concentration for extended periods, performing within a schedule, maintaining regular attendance and be punctual within customary tolerance. And then the last one on that page is moderately limited in completing a normal work day and work week without interruptions from psychological symptoms, which is consistent with the fact that she had severe mental impairments. She did have mental impairments that impacted her ability to work. That's why she had a severe impairment and that's why there were limitations in the RFC. The ALJ did limit, as your honors have pointed out, to simple routine repetitive tasks. And that's perfectly consistent with the finding that she had no significant limitations in attending to a schedule, maintaining attendance and maintaining attention and concentration for extended periods. So the same is true of Dr. Grassl's opinion as well. Mild limitations in maintaining a schedule did not require a reasonable fact finder to find that she could not sustain a schedule on a regular basis. I also want to highlight this court's decision in McIntyre, which is stated in our brief where this court held that an RFC for simple routine tasks sufficiently accounts for even moderate mental limitations in sustaining concentration, persistence or pace. So under that precedent as well as the substantial evidence supporting the ALJ's RFC finding, we would say that substantial evidence supports the ALJ's decision here. And if your honors have no further questions, I ask that you affirm. With 57 seconds to spare, very efficient. All right, thank you very much, Ms. Carter. Mr. Radle, you've got two minutes for rebuttal. Thank you, your honor. I'll just note again, there are aspects of the record where, as this court has recognized and as is expected, symptoms of mental illness wax and wane. But fundamentally, there's no question here, Ms. Bennett has a recognized severe psychological impairments, depression and anxiety. Those are recognized as severe by the Commissioner on Social Security. But the issue is the limitation though, right? That's correct. I'm saying the fact that she occasionally reported some symptom of improvement or denied anxiety here and there, or there are some reports of activities in the record, is not sufficient by itself, should not be sufficient by itself to overcome the opinion of her treating psychiatrist. Especially when, which in the context, as Judge Nathan pointed out, there are three other opinions from mental health providers, all of whom indicated limitation with respect to her ability to manage stress and sustain a schedule. And I think to counsel's point, sure, there are accounting for simple and routine instructions is a RFC limitation that accounts for difficulties with concentration, persistence, and pace. What's missing here is difficulties dealing with the stress of maintaining a consistent work schedule. So the RFC could have limited Ms. Bennett to low stress work, work that did not involve production quotas, work that did not involve direct supervision or less frequent supervision. None of those limitations are contained though in the RFC determination. Counsel, but you've raised as the issue here the failure to properly apply the treating physician rule, right? Yes. So, and I understand that we're bringing in all the other medical opinions and records because of the question of whether it can be discounted in light of its inconsistency. But there are other factors to consider in terms of the assessment of a treating physician rule. So I want to bring us sort of away from the RFC generally, which is where you've been going, where your brief says the issue is the treating physician rule. So how many times did your client see Dr. Alejo? Right. It was a six month period, right? Right. I would have to check the record again. I think it was periodically over the course of six months. Of course it was periodically. Right, yes. But like every three months or every three days? Because I wasn't able to figure that out and he doesn't indicate it. Because of course the frequency and duration of the treatment relationship is an incredibly important part. If he saw her twice, wouldn't that undermine the strength of his opinion? Yes, I think if that fact was a fact that the ALJ relied on, yes it would. If the record had been developed in that respect, that would have been a reason for a factor to be considered when weighing his opinion, yes. The length of the treating physician- We don't know the frequency of the treatment in this case. Yes, that's correct. We just know the duration. Right, the duration is six months, that's correct. And I guess I would say if the court thought that was dispositive, then a remand for further development to determine what the actual frequency of the treating relationship, that would be an appropriate result as well. And something that could be further developed as part of the remand. All right, Mr. Riddle, can I ask you to do this? Yes, sir. If I give you a week, can you then submit a letter to the court indicating whether you wish to make a supplemental filing? And if so, why it's appropriate? I just, I don't, I know the government said that they would have no objection to a filing, but I think that you have to at least establish why it's appropriate. If this was information that's been known for five months, is that relevant to our determination as to whether to grant it? But you may decide you don't even need it, that it doesn't change anything. And if that's the case, let us know that too. Is a week enough time to do that? Yes, Your Honor, thank you. Okay, so what's today, the 12th, so the 19th? Yes, Your Honor, thank you. Great, all right, thank you both very much. We'll reserve decision. Thank you. And we'll move now to the last case on today's calendar. That's Brutus Treating versus the United States. Thank you. I guess it's really standard charter, it is the defense, but the United States is a third party. Is it Mr. Sinkar? Yep. Am I saying that right? You're one of the few who gets that right the first shot. Really? That's pretty straightforward, it looks like. How else would you do it? I tell you, it's been butchered by brilliant people, I tell you. I'm jinxed by something. Mr. Sinkar. That's why he got it right. Yes, exactly, exactly. Which gives me hope. You watch it. Which gives me hope about your ultimate resolution of this case. You know, anyway, I'll look anywhere for it. Let me just state, you've got ten minutes, but you've reserved three minutes for rebuttal. Yes, sir. So, go ahead. Okay. May it please the court, and actually, good afternoon. We appeal the district court's order granting the government's motion to dismiss our case under the False Claims Act. And we've raised a number of different points in our briefs. I'm not going to go over them here. They, I believe, merit your consideration. But I'm going to address two points. But I would like to start by anticipating a question that I think you're going to ask me in light of your exchange earlier. And that is, pending in the United States Supreme Court, is U.S. ex-rel Polanski versus Executive Health Resources. It was argued about a month ago. And the question is whether this court should hold your decision pending Polanski. And I must reluctantly say yes. And the reason is this. The main argument that the Polanski petitioner advances there is that the government does not have the power to make a motion to dismiss once it has declined to intervene in a False Claims Act case. So it's quite a fundamental proposition. We have not made that argument here. But if the Supreme Court accepts that argument, depending on how they write that, and they say the government never had the authority to do what it has done here, that obviously affects these proceedings. So you can't get around that. Well, what you're saying is that you would make a different argument in light of the ex-rel Polanski petitioner. Well, it depends what the court says. Well, that may be. But, I mean, you've made an argument which is saying we should follow the Ninth Circuit rule, right, in essence. Yes. But that's different, Your Honor. If the U.S. doesn't have authority later, that's the end of it. Yeah, the Ninth Circuit doesn't matter. They are saying that once the government has considered the case and declined to intervene, it no longer has the power to seek a dismissal of the relator's case. That's the argument that the Supreme Court commanded cert on. And so that's a pretty fundamental argument in the world of False Claims Act cases. And so it would have significant impact here. If the court agreed with the petitioner, we would certainly be saying something about that in this case, even though we have not made that argument here. You're saying it's not a waivable point. Is that what you're saying? I believe that would be the case. But, again, it depends how the Supreme Court phrases what they say. Well, this one, I mean, unlike the other one, this one we'll certainly know by June probably, right? Oh, yes, exactly. Yeah, so, I mean, in the world of court decision-making, that's not necessarily a long time. This is the Second Circuit. Come on. Well, I try cases in the rocket docket, Your Honor, so that's a little bit different in Virginia. But part of this case has been going on for a really long time, too. Right, and there's that question, and then assuming that the United States can move to dismiss, then there's the standard question, the question of what standard to apply. That's exactly right. That clearly affects, unless we could say under any standard. Correct, and in Polanski, the government has run its unfettered discretion argument, and the Polanski petitioners have embraced Sequoia, and they frame it, I think, in a pretty commonsensical way, which it's like an APA standard. It's arbitrary, irrational. Was the decision to dismiss arbitrary or irrational? And I think that's a good rule of thumb. That's what we would certainly embrace here. But the two issues that I'd like to address, first of all, is that we contend that under the False Claims Act and procedural due process, the district court erred in failing to hold an evidentiary hearing to adjudicate the government's motion on the particular record here, which involved sharply conflicting evidence and testimony from us, challenging the record that they put forward in the court. And indeed, the district court's opinion is striking in that it talks about all of the government's declarations and so forth. It mentions we filed some. But in coming to the conclusion that, oh, this is just a subjective disagreement, the court never examines or articulates what in our evidence suggests that that's the case. There are many False Claims Act cases where a petitioner will say, ah, you lazy bums, you just didn't do a good job. We are so far removed from that, and I think our briefs and the record detail very specifically in terms of the government's contentions that we didn't provide certain information, and so they couldn't make that judgment. And it's really quite striking. And I'll give you a couple examples just for purposes here, but we detail these in our briefs. First of all, the government contends that the district court concluded that the government had a valid purpose to terminate this case early because our factual allegations were meritless. So that's how you get into this whole thing. And what we put in the record was a challenge to that factual characterization. So, for example, the government's decision is based on a fraction of the evidence we produced. One of the people involved in this, who's named in the brief, Mr. Chandra, produced 20,000 records in September of 2013 showing illegal transactions, illegal counterparties, and most importantly within that, and this is discussed a bit in our briefs, is a document called the Juniper 35 list. And what that was, was that was an internal study done by Standard Chartered of these transactions. It was looking at what they did. So Juniper 35 is rich with illegal transactions, illegal counterparties, and so forth. So that 20,000 records came in in September 2013, but the government said it shut down its investigation in August of 2013. And it didn't let us know. And, indeed, Mr. Chandra, who got these records at some personal physical risk, they had asked him to get this stuff, and he kept doing it. Now, I know that in the record the government says, oh, we looked at these 20,000 records. Well, outside of the implausibility of that, just in terms of the time frames involved, as I say, with Juniper 35 in there, you cannot have reviewed those records and say, ho-hum, we didn't provide information like that. But there's things that are even simpler. The government... But is this an argument, then, that the government's decision is fraudulent, arbitrary, or capricious? Their decision to move to... It's arbitrary and irrational, because their investigation was utterly arbitrary and irrational. It was closed off, and they contend that their investigation was thorough. But it was thorough because they didn't consider, they say, that we didn't produce all this evidence that we say we did. And in that context, and again, the merits of this dispute are not here. It is simply that in the face of that, and we don't believe that the hearing required on a government motion to dismiss in the false claims act is required for every case. But in the particular situation here, and even the hearing... Excuse me. Even the hearing that we're asking for is modest. But the court had this information. You're just saying that you felt that the district court's order didn't reflect that it had carefully considered the written submission. No, your Honor, and thank you for asking that question, because I want to be really clear about this. Essentially, because of the detail of what we put in... But again, you're saying what you put in, so you gave it to the district court. Yeah, but the point is, your Honor, is that the credibility of these witnesses are absolutely essential. You can't just on the paper record... I mean, you know, we quoted in our brief Judge Frank and other luminaries from this circuit that you just can't resolve lots of things on affidavits. And so what we contend is that we should have had the ability to cross-examine, and the government cross-examined our folks, and that could be done in a range of different ways. We're not asking for a full trial. We could have depositions. And then from that, once credibility was tested with cross-examination, then there would be a record that the court could do exactly what your Honor is suggesting, but not here. But the second related part here is that the court in a bit stacked the record. I don't want to be too edgy about it, but we wanted to put in the testimony of Mr. Daniel Alter. Mr. Alter was the former general counsel of the New York Department of Financial Services. If you recall, this case originated when news that the government investigators, both New York and the Feds, were resolving a sanctions matter with Standard Chartered. Our clients, who created Brutus Trading, knew that what was going on was far worse than what the government was agreeing to. They got nowhere initially with the federal investigators, but Mr. Alter basically had one of those oh-you-know-what moments and started launching a much more vigorous investigation and so forth. So what we asked the court, we said, look, and we provided a very detailed offer of proof. It's at joint appendix, I'm sorry, 442, articulating what Mr. Alter could say. And he, as the lead investigator for New York, would articulate the value of what our clients put in that directly contradicts what these other investigators say. So we asked the court, look, the government's putting in all these affidavits, and this goes back to this credibility point, Your Honor, too. We should be allowed to at least depose Mr. Alter, and we needed a subpoena to do that. And the court denied that. So it's both the fact that the competing views of the evidence require cross-examination, require that testing and credibility testing of these witnesses, plus it's good. But your assertion is that the government was lying when it said the things it said in its submissions? I mean, even under the Ninth Circuit test, right? Then, at least for that test, the government has to at least articulate some reasons and a relationship between the reasons and the dismissal. And then the burden shifts to you, the relator, to basically say, well, those reasons are arbitrary, capricious, illegal, or fraudulent. So you're not saying fraudulent, right? Well, I don't know what was in the mind of these folks, but they were certainly wrong. But, Your Honor, your analysis, we are up at the first level. Remember, the district court's ruling, it said that there was a valid government purpose here. Because, and I quote, and what that purpose was, according to the district court, was early termination of a case, quote, as to which the government has determined that the factual allegations were meritless. That, by the way, is at Joint Appendix 777 and 778. So the factual allegations being meritless is the key conclusion of the government that creates this valid government purpose. You're saying there has to be a hearing on that before you even get to the second prong of the sequoia. Right, but our point is that the evidence challenges the government's determination that our factual allegations were meritless, because that's what drove the justification for termination. And that's the reasoning that the district court followed. So, but I would say, wherever you do it, the point is, is that the end result, dismissal of the case, was arbitrary and irrational, given that the evidence that we put in, and it really required resolution by this very modest evidentiary hearing. So we're way over, but I do want to ask one other question. If we take your advice and wait for the Supreme Court in Polanski, and they come back and adopt some variation on the D.C. circuit test, which is basically the government has unfettered discretion to do this, that would, I guess, resolve part of your appeal, but you still would argue of the procedural error of a lack of a hearing? It kind of depends on how it's written. I understand that. Yes, I would, and, Your Honor, I know I've gone over, but maybe in my rebuttal I will address the whole unfettered point, because I don't think that's what's going to happen for a range of different reasons, but the answer to your question is, I think, yes, if I understand your question. All right. Thank you. We'll now hear from your adversary. That's what I do with the sheet. I lost my sheet. Mr. Barnea. Mr. Barnea. Sorry about that. Mr. Barnea, did we go to law school together? We did, indeed. Nice to see you. It's been a long time. May it please the Court, good afternoon, Your Honors. In this case, the government found no evidence supporting the relator's allegations, concluded they were based on an invalid legal theory, and determined that permitting further litigation would waste government resources. The government thus moves to dismiss the relator's complaint under 3730C2A. So the invalid legal theory is not one that the district court really got to, right? The district court found that the dubiousness of the legal theory and the novelty itself justified the government's decision, and so it didn't even need to get to the actual invalidity of the legal theory. Its very dubiousness was itself a proper justification, which would be a perfectly acceptable basis for this court to affirm its decision. Perhaps I could start just by talking about Polanski, since that seems to be the elephant in the room. The government, you know, there doesn't seem to be any likely outcome of Polanski that would change the outcome here in terms of, that would cause this question. Likely outcome, but there, I mean, there's one out, one of the questions they're taking is whether the government, have taken is whether the government can move at this stage. If the answer to that is no, and I'm not saying, I don't disagree that's unlikely, but who knows. If the answer to that is no, then what? Well, actually, I think even in that case the government can prevail here, because what happened in Polanski is the government declined. The case went through litigation for months, if not years, and then, I believe it was the eve of trial or very late in litigation, the government then sought to intervene and to move to dismiss. That was hotly contested between the parties as to whether that was appropriate, why the government had waited so long. There's a very long record about that. And, you know, in that circumstance, there could be some, courts could come to different views as to whether the government waited too long to intervene to exercise its right. In this case, the government declined to intervene and immediately moved to dismiss. That was according to how we've always done it. In the Third Circuit in Polanski, in the Seventh Circuit, in a case that I cannot pronounce but starts with CIMZ and has many other letters after it, what the courts of appeals did in those cases was they said, well, we understand that in these cases the government did not separately move to intervene before it moved to dismiss, but we will construe the motion to dismiss as including a motion intervened for the limited purposes of moving to dismiss. And, in fact, in our brief we said the same thing to this court, that, you know, this would just be a procedural nicety. If the law had been clear, for example, however many years ago, that what the government must do in order to move to dismiss is to intervene, then we would have simply filed a notice that has two different words. Instead of we moved to decline to intervene and then move to dismiss, we would have simply said move to intervene for the limited purposes of moving to dismiss, and everything would have proceeded from that point. So it does not strike me as an outcome that I can conceive. So just technically, if that's the resolution, then now we construe the motion to dismiss as including a motion to intervene? That is what the Third Circuit and the Seventh Circuit did in both of those cases. In neither of those cases did the government move to intervene. And, again, absent a lengthy delay between those things, to fault the government on a procedural hiccup based on an after-the-fact ruling would seem sort of out of proportion to any possible outcome. It was a criminal context all the time, the Supreme Court. I mean, so, and usually their statutes and limitations have run based on new rules. Anyway, so you're saying we should or shouldn't wait for Polanski? I don't, at this point, given that it's already been argued and will be decided this spring, I don't see any reason why you wouldn't wait. It will, in all likelihood, settle this. It will certainly settle this question of intervention, and it will all likelihood set a standard for this court to use in reviewing the motion to dismiss, rather than this court having to engage in the, if we have to use the Ninth Circuit, we affirm for this reason, but if it's the D.C. Circuit or the Third Circuit standard. So I think it would simplify matters. There's no reason in my mind not to wait. I just don't view it as outcome determinative. I think it's just more for ease of drafting the opinion. So I'd like to talk about a few of the things that my adversary pointed out in his argument. First, I think it's important to talk about the notion of a hearing. First of all, which I want to be clear, whether the district court held a hearing here as a matter this court would review for abusive discretion only, that was made clear in the Abbey Summary Order and other places. The notion of whether a hearing is appropriate, first of all, several courts have pointed out that hearings in these cases are extraordinarily rare and must be justified by an extraordinary submission by the relator, but the hearing must be tied to the standard of review. So if the standard of review is, even in the Ninth Circuit, that the government acted in a constitutionally arbitrary way or unconstitutionally or infraudulently, then the only thing that should trigger a hearing is evidence of something like that, a significant showing of something like that, that the court would then have to resolve in a hearing. There is no basis for a hearing on simply the question of, did the government do a good job in its investigation in the relator's view? And so is it not one of degrees? It's not that they didn't do a good job. It's that they didn't do a good job to the point where it is an arbitrary and capricious decision. Well, again, I don't think that – there are several courts, and we cite them in our opinion, that cite the adequacy of the government's investigation in the relator's view as simply not being relevant to any of these standards. This is not about – So no investigation would not be susceptible to an allegation of arbitrary and capriciousness? Again, this is not arbitrary and capriciousness. This is not APA review. This is review even under the Ninth Circuit standard for whether – I'm talking about the Ninth Circuit standard, right? Right. The Ninth Circuit standard is not APA review to disagree with my adversary. The Ninth Circuit standard, if you read the Sequoia case carefully, talks about essentially the government acting fraudulently or arbitrary in a way that violates substantive due process, so that the government acted in such an egregious way as to, you know, violate the very role that it is supposed to take in a false claims act investigation or in moving to dismiss for an improper purpose. This is not, you know, did the agency, you know, consider all of the factors before issuing its regulation type APA review whatsoever. And we cite several cases, including the Sequoia decision itself from the Ninth Circuit that makes clear that – and it refers to the substantive due process standard from the Supreme Court in looking for exactly that. This is not let's all re-review the government's investigation and decide, you know, in a court of appeals whether the government's investigation was thorough enough or – But what if it was nonexistent? Well – Would that meet the standard for due process? It sort of depends on the issue. So the government in some cases may not investigate a false claims act case at all factually. So if, for example, a false claims complaint filed by a relator came in that was plainly on its face legally deficient, the government may say we're not devoting any AUSA's time to investigate the factual allegations here because even if they were true, the legal basis isn't there to allege a false claims act. Our office does that sometimes. There may be other reasons why – Let me just interrupt. So then would the district court be free to consider the merits of that legal conclusion? The district court can consider the good faith basis put forth by the government for why it – under the Sequoia standard, the good faith basis put forth by the government as to why it moved to dismiss a particular case. In some cases, as in this case it may be, we've investigated the relator's claim and found them to be without merit as well as others. In other cases, there may be other reasons why the government moved to dismiss. And so, yes, if there was an allegation that the government lied, that the agent committed perjury when he said we investigated these allegations when, in fact, he had not – if he said we interviewed the relator when, in fact, he did not interview the relator, perhaps that could amount to some kind of fraud on the court that would – I'm not sure what – You're saying that if the government just says we declined, we looked into it, we think it's meritless, that unless – this is under the Ninth Circuit's name – unless the relator can come up with something to say that's a lie, that whatever statement was just put in the declaration under penalty of perjury is false, then you don't get a hearing. Yes, because even in the most kind of – I don't know what to call it – liberal Ninth Circuit standard, it's really an inquiry into the government's good faith in moving to dismiss. These are the government's claims. These are claims of fraud against the government. The government has broad discretion in deciding whether to pursue them, to not pursue them, to dismiss them, or do whatever it wants with them. And the only question in judicial review, even in the Ninth Circuit review, is is the government exercising that authority, that very broad authority that it has to control its claims of fraud against it in bad faith? So unless there is some compelling reason to believe that the government acted in bad faith and some substantial showing by the relator that there was bad faith that would require some kind of evidentiary hearing to get to the bottom of, the role of the district court in reviewing these motions is extremely circumscribed, and rightly so because of the nature of the claim and the very sweeping power that is granted to the government in this provision. Furthermore, just – I see my time is up, but just to finish the thought – again, the government did not only rely on the comprehensiveness of its investigation to justify this dismissal. It also pointed to the legal inadequacy, which the district court didn't even feel the need to reach, but it is still there. In addition to its dubiousness, it is actually legal wrong. And furthermore, the government pointed out to the substantial use of government resources that would be entailed in this litigation, which itself many courts have routinely upheld as a justification for a government motion to dismiss. So we have three valid reasons here. And the fact that the relator feels that the investigation did not come out to his liking or that the relator does not understand or believes that the government came to the wrong conclusion in assessing the evidence that the relator presented to the government doesn't even come close to meeting the standard on one of those, let alone on the other two. So for all of those reasons, unless the court have any questions, we believe this court should affirm the district court's judgment. Thank you, Mr. Bernanke. We'll now hear from Mr. Sinkar for three minutes of your time. Much of my colleague from the U.S. Attorney's Office's argument focuses on trying to portray this case as something that it's not. This has nothing to do with us having an investigation that was not to our liking. But it also doesn't involve substantive due process. So the procedural issue here is a procedural due process one, and so his point about this high level to deal with substantive due process, this is in the briefs, but I want to clarify that. But two fundamental points I think I'd like to make, and going back to your question to me earlier, yes, the government agents lied. They lied in several different ways, and we articulate those in our briefs. You accused them of lying in the district court? Yes. You accused them of lying. Let me tell you what they did, and then you, you know. Show me where you accused them of lying. Contradicting them is not the same as lying. Well, and then let me tell you what the facts are, and then if you would prefer to call it contradiction, but I still think it goes to the point of whether their judgment that our case was meritless was arbitrary or irrational. One example of that concerns the spreadsheets that we produced from Standard Chartered with a lot of transactions. Now, the evil people at Standard Chartered hid much of the information behind hidden cells in those spreadsheets, and I'm not a techie by any stretch of the imagination, but you had to know how to open it to get to it. The government says that they never saw any hidden cells, and we never told them anything about it. Yet in the record is a detailed memorandum from Relators Council, Mr. Koenigsberg, taking step-by-step through how you open those hidden cells, and that particular letter was from January 9th, 2019. Well, this actually was a whole range of other things that he articulated. It's a Joint Appendix 753 of information that we provided to the government that the government agents had denied that we did. And there's a list in there. I mean, it's a lot of detailed information, which is why it is so different from the just we don't like this investigation case. I've never seen a case like this before in the false claims world. With the detailed evidence that we've put in, all we want is an evidentiary hearing to test the credibility of these people. The second thing, though, that I have to say is that the government's argument is woven through with this notion of very broad authority in this context. That is legally incorrect. They don't have very broad authority in the context of this case. The relator has a property interest in the cause of action and is equally a party in interest here. And the government, the False Claims Act was enacted in 1863. From 1863 to 1943, once the relator launched a case, no one could mess with that case. The government had no right to intervene or whatever. And in 1943, Congress changed the law slightly to allow the government to take over a case, and then in 1986 to allow the government to intervene after it had declined and so forth. But so the whole concept and the constitutional underpinnings of why the False Claims Act works and separation of powers and all that, it doesn't start with the notion that the government has some unique authority here. But related to that, though, is the congressional purpose of having relators wasn't just to deputize citizen, to broaden the arm of law enforcement, to protect the government from fraud. That was clearly one of the main ones. But another congressional purpose, and we've quoted this in our brief, and it's from the Senate report that we've quoted, that this court has quoted in other cases, which is 99-345, page 26. And there it says that the relator is to, quote, act as a check that the government does not neglect evidence, cause undue delay, or drop the false claims case without a legitimate reason, close quote. So I would respectfully submit, and the court has been so kind with the time, that the notion, it's the opposite of very broad authority here. It's not that the government doesn't have legitimate interests, but so does the relator, and the relator has been deputized by Congress to do certain things, including hold the government accountable when it wants to ditch a False Claims Act case. But it sounds, again, like Polanski may provide a lot of clarity as to how broad or narrow the government's authority is. Knock on wood, I hope so, Your Honor. Okay. We will reserve decision. Thank you all very much. That concludes the arguments for today's calendar. Let me thank our corporate deputy, Ms. Beard, who is asked to now adjourn the court. Court is adjourned. Thank you.